UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CAPE HAZE INVESTMENTS, LTD., *et al.*,

Plaintiffs,

v.

RICHARD D. EILERS,

Defendant.

Case No. C08-809RSL

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter comes before the Court on a motion for summary judgment filed by plaintiffs Cape Haze Investments, Ltd. and Thomas Scott (collectively, "plaintiffs") to collect money due on two promissory notes. Although defendant concedes that the notes are valid and that he personally guaranteed them, he argues that he is not obligated to pay the amounts due for various reasons addressed below.

For the reasons set forth below, the Court grants plaintiffs' motion.

## II. DISCUSSION

**A.  Background Facts.**

Scott formed T.C. Scott Machining Ltd. in Oregon in 1971. In 1999, Scott decided to sell the business and retire to Florida. Scott sold the business to Eilers, a former employee, and to

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 1

Eilers' friend Chris Allender for $640,000. The buyers paid $100,000 in cash and financed the remaining amount with two promissory notes. The first note, for $360,000, was for the benefit of the business. The second note, for $180,000, was for the benefit of Scott personally in exchange for his agreement to sign a Non-Compete, Non-Solicitation Agreement.

Both agreements and both promissory notes listed Eilers and Allender as "guarantors." They signed the agreements and promissory notes as such. Declaration of Thomas Peterson, (Dkt. #13) ("Peterson Decl."), Exs. C-F. The notes stated that Allender and Eilers "will absolutely and unconditionally guarantee the conditions of the agreement contained herein." Id., Exs. E, F. In addition to the promissory notes, the contract for the sale of the business granted plaintiffs a security interest in some of the company's physical property, including certain machines. In 1999, Scott filed a Uniform Commercial Code Form 1 ("UCC-1"), a security agreement used to place liens against specific business property. The UCC-1 listed some of the business's property as agreed to by the parties.

After selling the company, Scott did not retain any management or ownership rights.[1] Eilers became the president of the company, and Allender ran the shop, including supervising employees and production.

Scott inadvertently let his UCC-1 lapse in October 2004. He did not learn of the lapse until May 2005. At that time, he filed a revised UCC-1 and learned that Eilers had filed his own UCC-1 just days before on some of the same company property. Scott's revised UCC-1 added two machines and subtracted a pickup truck from the previously filed form.

After purchasing the company, Eilers' and Allender's working relationship progressively deteriorated. By February 2005, they were unable to work together. Eilers and Allender began negotiations for Eilers to leave the company. At one point, Eilers believed that they had reached

---

[1] After he sold the business, Scott changed the name of TC Scott Machining, Ltd. to Cape Haze Investments, Ltd. Eilers and Allender changed the name of their purchased business to TC Scott Machining, Inc.

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 2

a tentative agreement, and he took some actions as a result, including removing himself from the company payroll, ceasing to perform his duties, and personally paying off some of the company's debts. Eilers believed that Allender was obligated to persuade Scott to release his obligation under the notes. Eilers Dep. at p. 77. Scott never promised Eilers that he would release his obligation. Id. & p. 79.

During the protracted negotiations, the company continued to make payments due on the promissory notes. However, the company failed to make the payments for the months of November and December 2005 and January 2006. On or around January 30, 2006, Scott declared default on the notes, accelerated the balances, and stated that arrangements should be made to turn over the collateral secured by the notes. The notes contain the following default provision:

> If any payment obligation under this NOTE is not paid within the due date plus thirty (30) days, and lender has not received notification from borrower of skipping payment, the remaining unpaid balance and any accrued interest on this NOTE shall become due immediately at the option of the lender.
>
> * * * *
>
> If borrower fails to perform any terms of this NOTE, time of payment and performance being of the essence, the lender shall, at his option, have any and all of the following rights: (a) to declare the full unpaid balance of the NOTE immediately due and payable, (b) to specifically enforce the terms of this NOTE, (c) to declare a forfeiture of purchaser's interest in said properties in the manner provided by Oregon law, (d) pursue any and all other rights or remedies provides by law or equity.

Peterson Decl., Exs. E & F. The balance on the notes at the time of default was $222,720.41 and $118.123.74, respectively.

In late January 2006, Scott made arrangements to repossess the collateral listed in the revised UCC-1. Scott arranged to have a third party pick up the collateral on February 3, 2006. On February 16 and 17, 2006, notices were sent to the parties, including Eilers, stating that plaintiffs planned to sell the collateral to a third party, Clear Stream Technologies, Inc. ("Clear Stream") in a private sale. Scott sent a list of the collateral to Doug Harbord of Clear Stream. Harbord sent the list for an independent appraisal by two different used machine tool dealers. After receiving the appraisals, Harbord offered to buy the machinery for the higher price from

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 3

the two appraisals. Scott accepted the offer.

The total amount due on the notes was reduced by the amounts recovered after repossession and sale of the collateral, which totaled $137,500. Therefore, the principal balance due and owing on the notes, before interest and attorney's fees, is $203,344.15.

**B.    Summary Judgment Standard and Evidentiary Issues.**

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, the records show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

All reasonable inferences supported by the evidence are to be drawn in favor of the nonmoving party. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). "[I]f a rational trier of fact might resolve the issues in favor of the nonmoving party, summary judgment must be denied." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." Id. at 1221.

Eilers filed a surreply seeking to strike portions of plaintiffs' reply and supporting documents. Eilers argues that the explanation in Scott's declaration conflicts with his deposition testimony regarding why Allender forwarded him e-mails from his attorney. The Court has not considered that evidence because it is irrelevant. Eilers also moved to strike Scott's declaration statements regarding the appraisal and the resale value of the machinery as inconsistent with his

deposition testimony. The deposition testimony, however, is consistent. Scott Dep. at pp. 132-37 (explaining that Harbord explained to him that the earlier appraisal overvalued the old and outdated equipment). Eilers also moves to strike the declaration statements regarding what Harbord told Scott as hearsay. The Court considers the statements not for the truth of the matter asserted but as evidence of Scott's understanding at the time.

Eilers also objects to Scott's and Allender's statements in their declarations regarding whether they colluded with each other and/or had an agreement. He contends that those statements are legal conclusions. The Court considered those statements to the extent that they reflected Scott's and Allender's own beliefs; however, the Court drew its own legal conclusions. The Court did not consider Allender's statement in paragraph 5 of his declaration that Scott asked to be kept apprised of the state of the negotiations.

Eilers requests that the Court strike the statement in plaintiffs' reply brief that they gave value, the pickup truck, for the May 2005 UCC-1. That statement is stricken as unsupported. Furthermore, Eilers argues that plaintiffs mischaracterized his responsive memorandum at page seventeen by stating that he "admitted" that he stepped down as an officer and director of the company in May 2005. The memorandum speaks for itself on that issue.

**C. Analysis.**

Eilers concedes that the notes and his guarantees are valid and enforceable. He also concedes that the company failed to make payments and was in default. Nevertheless, Eilers contends that (1) he was discharged from his guarantee because the lapse in Scott's UCC-1 materially increased the risk to him, (2) plaintiffs' taking of the company's assets undermined Eilers' right to exoneration, and (3) the sale of the collateral was not commercially reasonable. The Court addresses each of those arguments in turn.

Under Oregon law,[2] certain changes to circumstances surrounding a contract discharge a

---

[2] The parties agree, and the Court finds, that Oregon law applies to this dispute as set forth in the contracts. The notes provide that they "shall be construed in accordance with the

guarantor's obligation. To determine if a discharge occurred, the reviewing court must first determine whether the guarantor consented to the modification; if he did, the guarantor is not discharged. See, e.g., Marc Nelson Oil Prods., Inc. v. Grim Logging Co., Inc., 199 Ore. App. 73, 80 (2005). In this case, Eilers did not consent. Next, the Court must determine whether the guarantor was compensated, and Eilers undisputedly was. Under those circumstances, Eilers will be discharged only if the alteration to the contract "materially increases the guarantor's risk on the contract." Id. "A modification materially increases a guarantor's risk when a 'careful and prudent person undertaking the risk would have regarded [the modification] as substantially increasing the chances of loss.'" Id. at 82-83 (quoting Lloyd Corp. v. O'Connor, 258 Ore. 333, 337 (1971)). Whether the risk is increased "will turn on the particular facts of each case." Id. at 83 (finding that the guarantor was discharged when the contract was assigned without his knowledge or consent). The Court considers how the situation "might work out, and how it did work out, as far as affecting the obligation of this guarantor." Marshall-Wells Co. v. Tenney, 244 P. 84, 88 (1926).

Eilers argues that the lapse in the UCC-1 increased his risk because another party could have filed a security interest in the interim and obtained a higher priority right to collateralize the assets.[3] If that had occurred, the assets might not have been available to satisfy a portion of the debt, increasing Eilers' exposure. However, nothing in any of the contracts required plaintiffs to sell the collateral listed in the UCC-1 before proceeding against the guarantors. Therefore, plaintiffs could have proceeded against them for the full amount due without selling the assets and deducting the proceeds. That fact alone dooms Eilers' claim that the lapse in the UCC-1 increased his risk. Moreover, no third party ever filed a UCC-1. As a result, the assets were

---

laws of the State of Oregon." Peterson Decl., Exs. E, F.

[3] Even if the lapse in the UCC-1 discharged Eilers, the discharge would only be partial. As plaintiffs note, only the note for the sale of the business was secured by the UCC-1. The second note, for approximately $188,000, was not secured by the UCC-1, so the lapse could not have increased Eilers' risk on that note.

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 6

available to satisfy a portion of the debt, and they did so. In addition, Eilers had notice of the lapse in the UCC-1. That fact distinguishes this case from *Marc Nelson*, in which the defendant lacked notice that his obligation had been assigned to a third party. 199 Ore. App. at 84 (explaining that because the guarantor was unaware of the assignment, his "practical ability" to protect himself was impaired). In this case, Eilers had knowledge of all of the relevant facts. In fact, he knew of the lapse in the UCC-1 before plaintiffs did. Eilers arguably consented to the change in circumstances because he filed his own UCC-1, rather than notifying plaintiffs of the lapse and allowing them to quickly cure the defect.

Eilers also contends that plaintiffs interfered with his right to exoneration. As a guarantor, he had a right "to bring proceedings to compel the debtor to perform his obligation." Eilers' Opposition at pp. 12-13; Marc Nelson Oil Prods., 199 Ore. App. at 84 (explaining that a surety has a right "upon default of the principal debtor and before payment, to bring proceedings to compel the debtor to perform his obligation") (internal citation and quotation omitted). Eilers never brought any such proceedings, despite knowing about the lapse in the UCC-1, the troubled state of the business, and the subsequent default. Moreover, because Eilers was a fifty-percent shareholder in the company, any enforcement proceeding would have been against himself in significant part. Any such proceeding would have been futile because at the time the assets were sold, Eilers noted that the company had been "bled dry" and had no means to repay its debts. Eilers Dep. at p. 87.

Eilers contends that he was precluded from exercising his exoneration rights because plaintiffs "gutted" the business. However, plaintiffs merely exercised their right to collect on the outstanding debt. Even if plaintiffs' later filed UCC-1 was invalid as Eilers alleges, plaintiffs had at least an unperfected security interest in the collateral pursuant to the contract. Peterson Decl., Ex. C at p. 10 ("Seller shall be in the first position as security holder pertaining to the assets listed in Exhibit 'A', inventory and intangibles"); id. at pp. 7-8 (listing remedies on default). Eilers' claim that his interest had a higher priority is directly contradicted by the

parties' contract and is based on his erroneous conclusion that his UCC-1 was valid. His security interest was invalid because he never obtained a signed security agreement from the company. See, e.g., In re Summit Creek Plywood Co., Inc., 27 Bankr. 209, 212 (Bankr. D. Or. 1982) ("The UCC requires that a security agreement contain a description of the collateral and that it be signed by the debtor.") (citing ORS 79.2030(1)(a)).

Eilers further alleges that plaintiffs, working in collusion with Allender,[4] excluded him from participating in the transaction to repossess the collateral. Eilers has not shown that he had a right to participate in the repossession and subsequent sale; the contracts do not provide him that right. Although Eilers may now wish that he had played a greater role in the company's operations prior to the default, plaintiffs did not prevent him from doing so. Rather, Eilers made the decision to discontinue his involvement with the day to day operations of the company without securing a release from plaintiffs for his obligation on the notes.[5] Eilers also contends that plaintiffs removed property from the premises that was not part of the security agreement. However, the record shows that Allender, not plaintiffs, caused the removal of the additional property.[6]

Eilers also complains that Scott interfered with his negotiations with Allender "to prevent Allender from going forward with consummation of the separation agreement." Eilers' Opposition at p. 17. In an attempt to support that argument, Eilers attributes much of Allender's conduct to Scott without a basis for doing so. Regardless, the only negotiations-related issue

---

[4] Eilers has not shown that Allender and Scott improperly colluded. In fact, Eilers stated during his deposition that at least until March 2005, Scott was his "confidant" and on his side. Eilers Dep. at p. 60.

[5] To the extent that Eilers reduced his role because he believed that he and Allender had an agreement and partially performed, his complaint is with Allender, not plaintiffs.

[6] Even if plaintiffs removed two additional machines that were listed in the May 2005 UCC-1 but not in the earlier documents, Eilers has not shown that the removal of those two machines undermined his right to exoneration.

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 8

relevant to the claims in this case is whether plaintiffs released Eilers from his guarantees. The record shows that both Allender and Eilers asked Scott to release Eilers' obligation as guarantor, Scott offered to do so only if Eilers agreed to certain conditions, and Eilers adamantly refused to agree to the conditions. Eilers Dep. at p. 77 (explaining that Scott never agreed to release his guarantee; Allender was responsible for persuading Scott to release Eilers as part of the separation agreement negotiations). Under these circumstances, plaintiffs did not materially increase the risk to Eilers or interfere with his exoneration rights.

Eilers also contends that a triable issue of fact remains regarding whether plaintiffs sold the company's collateral in a commercially reasonable manner. He argues that plaintiffs should have obtained a higher price for the collateral. In support of that argument, Eilers notes that Scott obtained an appraisal of the equipment in June 2005 but ultimately sold the equipment for less than the amounts calculated in that appraisal. Plaintiffs have explained that they believed that the June 2005 appraisal did not reflect the true value of the machinery. Declaration of Thomas Scott, (Dkt. #22) at ¶ 5 (explaining that Scott understood that the June 2005 appraisal did not accurately value the old and outdated machinery). Eilers has not provided any evidence to show that the equipment actually could have been sold for the prices listed in the June 2005 appraisal. Moreover, the numbers listed in that appraisal reflect inadmissible hearsay.

Furthermore, in February 2006, Harbord of Clear Stream obtained two independent appraisals for the property, and plaintiffs sold it for the higher amount. The two independent appraisals are evidence of the market value of the property. ORS 79.0627(2)(b). Although Eilers faults plaintiffs for failing to obtain their own appraisals, he has not presented any evidence to show that it was unreasonable for plaintiffs to accept appraisals obtained by the purchaser or that doing so was unusual in the industry. Nor has Eilers shown that he suffered any actual loss as a result of the sale. Pursuant to ORS 79.0627, a debtor is entitled to any "loss" caused by the creditor's failure to sell the collateral in a commercially reasonable manner; the amount of the loss is the difference between the price actually obtained and the price that could

have been obtained by proceeding in a commercially reasonable manner. See, e.g., CIT Corp. v. Nielson Logging Co., 75 Or. App. 267 (1985). Eilers had provided only his own speculation that the price obtained was too low. Eilers Dep. at p. 113. Finally, plaintiffs provided notice of more than ten days before the sale of the collateral as required by ORS 79.0611(2), 79.0612(2). The notice was sent to all parties, including Eilers. Eilers did not halt the sale. Accordingly, plaintiffs are entitled to summary judgment on this issue.

### III. CONCLUSION

For all of the foregoing reasons, the Court GRANTS plaintiffs' motion for summary judgment (Dkt. #12). The Clerk of the Court is directed to enter judgment in favor of plaintiffs and against defendant.

DATED this 23rd day of February, 2009.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT - 10